| | | |
|---|---|---|
| K.W. | : | CIVIL ACTION |
| *A MINOR, BY AND THROUGH HIS* | : | |
| *PARENT AND GUARDIAN DELORES* | : | No. 16-5578 |
| *WHITE*, et al. | : | |
| | : | |
| v. | : | |
| | : | |
| SOUTHEASTERN PENNSYLVANIA | : | |
| TRANSPORTATION AUTHORITY, et | : | |
| al. | : | |

## MEMORANDUM

**Juan R. Sánchez, J.**                                                    **March 30, 2018**

This case arises out of a tragic accident in which a SEPTA bus making a left-hand turn struck two pedestrians in a crosswalk—Sheena White and her eight-year-old son, K.W.—killing White and seriously injuring K.W.  In this wrongful death and survival action, Plaintiffs Delores White, individually and as parent and natural guardian of K.W., and William A. Love, as administrator of Sheena White's estate, bring claims pursuant to 42 U.S.C. § 1983 and state law against Ronnie McGill, the driver of the bus involved in the accident; SEPTA; and four SEPTA executives—Chairman Pasquale T. Deon, Sr., General Manager Joseph M. Casey, Chief Officer of System Safety Scott Sauer, and Chief Surface Transportation Officer Michael R. Liberi.[1] Plaintiffs also bring state law products liability-related claims against New Flyer of America, Inc. (New Flyer America), and its parent company, New Flyer Industries Canada, ULC (New Flyer Canada),[2] one or both of which designed, manufactured, and supplied SEPTA with the bus

---

[1] Deon, Casey, Sauer, and Liberi are referred to collectively as the "SEPTA Executives." McGill, SEPTA, and the four SEPTA Executives are referred to collectively as the "SEPTA Defendants."

[2] The New Flyer entities are referred to collectively as "New Flyer."

involved in the accident, and Rosco, Inc., the company that supplied the bus's allegedly defective driver's side mirror system.

The SEPTA Defendants, New Flyer, and Rosco each move to dismiss portions of Plaintiffs' 23-count Amended Complaint. For the reasons set forth below, the SEPTA Defendants' motion to dismiss will be granted in part insofar as Plaintiff's § 1983 claims—the only federal claims in the Amended Complaint—will be dismissed. Because all of the remaining claims in the Amended Complaint arise under state law, and because diversity jurisdiction is lacking in this case as Plaintiffs and SEPTA are all citizens of Pennsylvania, the Court will decline to exercise supplemental jurisdiction over the balance of the case and will remand the case to the Court of Common Pleas of Philadelphia County from which it was removed. Insofar as Defendants seek dismissal of Plaintiffs' state law claims, their motions will be denied without prejudice to reassertion in state court.

## FACTS[3]

The accident giving rise to this lawsuit occurred in the early evening on September 26, 2014, at the intersection of 15th Street and Washington Avenue in Philadelphia. Prior to the accident, Sheena White and her son were standing on the northeast corner of the intersection,[4] waiting to cross Washington Avenue, heading south on 15th Street. Gill was driving a SEPTA transit bus in a southbound direction on 15th Street, approaching the intersection from the north.

---

[3] The following facts are drawn from Plaintiffs' Amended Complaint, whose "well-pleaded factual allegations" this Court must accept as true for purposes of evaluating the instant motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

[4] The Amended Complaint alleges White and K.W. were standing on the southeast corner of the intersection, Am. Compl. ¶ 61, but this appears to be a typographical error, as the Amended Complaint also alleges White and K.W. proceeded to walk south across Washington Avenue, traveling in the same direction as a south-facing SEPTA bus, *id.* ¶¶ 59, 62-65.

After the traffic light controlling southbound traffic on 15th Street turned green, White and her son began walking across Washington Avenue in the crosswalk. At the same time, Gill made a left-hand turn from 15th Street onto Washington Avenue, striking White and her son with the front end of the bus. Upon impact, White was knocked to the ground, her body became entrapped in the undercarriage of the bus, and the wheels of the bus rolled over her, causing her to sustain fatal injuries. K.W. survived the collision, but sustained serious physical injuries and experienced the trauma of witnessing his mother's sudden and traumatic death.

The bus in question, a 2008 New Flyer model with vehicle identification number 5FYH4FV188B033825, was designed and manufactured by New Flyer. SEPTA purchased the bus pursuant to an April 8, 2003, contract with New Flyer America, in which New Flyer America agreed to furnish heavy duty low-floor transit buses to SEPTA in accordance with SEPTA's technical specifications, including the requirement that buses be equipped with a Rosco model 715F mirror mounted on the left front side of the bus. SEPTA's specifications required that the mirror be mounted so as to "give the operator a view of traffic alongside and beyond the bus" and to "minimize blind spots for the operator in front of mirrors." Am. Compl. ¶¶ 31-32. The exact placement of the mirror, however, was to be determined by New Flyer. *See id.* ¶¶ 33-34. In mounting the model 715F mirror on its buses, New Flyer relied on the specifications, instructions, or manuals supplied by Rosco. *See id.* ¶ 39.

According to the Amended Complaint, the size, shape, configuration, and placement of the model 715F mirror created an unreasonably dangerous obstruction of the driver's view when making a left-hand turn, and buses equipped with a model 715F mirror were reported to have a high incidence of collisions or near misses with pedestrians during left-hand turns. Although New Flyer knew of these problems—and knew of ways to abate them—before it sold the bus in

question to SEPTA, it did not alter (or recommend that SEPTA alter) the design or configuration of the mirrors, and failed to warn SEPTA of any risks associated with the blind spot its design created. Rosco also failed to warn either New Flyer or SEPTA of the dangerous vision obstruction inherent in its model 715F mirror when mounted in a vertical position at or just below the driver's eye level near the "A pillar" on the driver's side of a transit bus. *Id.* ¶¶ 54-55.

In addition to faulting New Flyer and Rosco for the flaws in the model 715F mirror system, Plaintiffs allege SEPTA knew or had reason to know, beginning as early as 2003, that the mirror system on the New Flyer buses created a dangerous blind spot for drivers while making left-hand turns. After New Flyer buses equipped with the model 715F mirror system were placed into service, transit bus drivers and representatives of Transportation Workers Union Local 234 began reporting to SEPTA managers and policymakers that the mirror system presented a dangerous vision obstruction during left-hand turns, voicing their concerns during Location Safety Committee meetings,[5] in Safety Hazard Forms and Vehicle Condition Reports,[6] and in grievances filed by the union in response to disciplinary actions SEPTA initiated against transit bus drivers involved in "left-hand turn pedestrian knock down events." *See, e.g.*, *id.* ¶¶ 73-77, 80, 82.

In 2004, New Flyer buses equipped with Rosco model 715F mirrors struck and killed pedestrians during left-hand turns on two occasions, one in May and one in December. *See id.* ¶¶ 84-85. SEPTA safety managers investigated both incidents, conducting a partial reenactment

---

[5] Such meetings are referred to elsewhere in the Amended Complaint as "Local Safety Committee" meetings. Am. Compl. ¶ 127.

[6] According to the Amended Complaint, SEPTA required transit bus drivers to complete Safety Hazard Forms and/or Vehicle Condition Reports to report unsafe conditions to SEPTA management. *See* Am. Compl. ¶¶ 73, 79.

of the December 2004 pedestrian knock down event later the same month. *See id.* ¶¶ 84-87. Following the reenactment, a SEPTA Systems Safety Officer published an intra-office memorandum reporting that drivers may experience a moment of visual obstruction "if a pedestrian is exactly aligned with the left side front windshield support structure divide," but rejecting the notion that the New Flyer buses had an engineering flaw. *Id.* ¶¶ 86-87. A training bulletin issued contemporaneously with the intra-office memorandum advised transit bus operators that the mirrors could obstruct their view and instructed them to lean forward or around in the driver's seat to minimize the obstruction.[7] *Id.* ¶ 88.

In March 2008, another SEPTA Systems Safety Officer published an intra-office communication reporting that as a result of the Rosco mirror system on the New Flyer buses a bus operator could lose sight of pedestrians in a crosswalk for approximately two seconds—and up to five feet of pedestrian movement—during a left-hand turn, but deemed this degree of visual obstruction an acceptable risk. *See id.* ¶¶ 104-05. Approximately six months later, in September 2008, a third pedestrian died after being struck by a left-hand-turning New Flyer bus as the pedestrian crossed the street. *See id.* ¶ 94. SEPTA safety managers investigated the incident, *see id.*, but the Amended Complaint does not describe their findings.

At some point during 2008, the Transit Cooperative Research Program published a report entitled *Guidebook for Mitigating Fixed-Route Bus-and-Pedestrian Collisions*, which "highlighted the concerns of transit agencies and stakeholders throughout the United States and

---

[7] Several months later, in May 2005, the *Philadelphia Daily News* reported on the blind spot caused by the driver's side mirrors on SEPTA buses based on "tests" the *Daily News* performed at the SEPTA bus depot. *See id.* ¶ 90. In an article entitled, "Death Mirrors—A Blind Spot on Bus Fatalities," the author described his experience sitting in the driver's seat of a parked bus while union officials acted as pedestrians crossing the street, reporting that he "saw pedestrians on the driver's side 'disappear' behind the mirror." *Id.* ¶ 91.

Canada with regard to left-hand turn transit bus-pedestrian collisions."[8]  *Id.* ¶ 97.  The report

noted that "[b]us components—such as A-pillar and side mirrors—might create blind spots,

which obstruct the operator's view of pedestrians," and recommended strategies to mitigate left-

hand turn bus-pedestrian collisions, including changing the position and/or size of the driver's

side mirrors.[9]  *See id.* ¶¶ 98-99.  SEPTA's then-General Manager was a member of the Transit

Cooperative Research Program committee that published the report.  *See id.* ¶¶ 102-03.

A later study reportedly conducted by SEPTA found that during the period from 2007 to

2011, 50% of all bus-pedestrian contacts involving New Flyer transit buses equipped with model

715F mirrors were left-hand turn pedestrian knock-down events.  *See id.* ¶ 108.  In April 2011,

moreover, a union official informed SEPTA that statistics maintained by the union revealed that

of 53 bus-pedestrian collisions involving New Flyer buses equipped with model 715F mirrors

that occurred between January 4, 2010, and April 22, 2011, 51 occurred during left-hand turns.[10]

*See id.* ¶ 110.  In June 2011, SEPTA revised a directive relating to pedestrian hazards to

---

[8] According to the Amended Complaint, even before the report was issued, transit agencies in other cities around the country were making efforts to eliminate bus-pedestrian left-hand turn collisions as early as 2006.  *See* Am. Compl. ¶ 93.

[9] The report suggested replacement mirrors could be obtained for as little as $20 to $50 per mirror.  *See* Am. Compl. ¶ 100.

[10] While SEPTA's own study purportedly revealed some type of increase in the number of bus-pedestrian contacts involving New Flyer buses equipped with model 715F mirrors in 2010 and 2011, *see* Am. Compl. ¶¶ 106-07, regional transit authorities in other areas, such as Cleveland, were succeeding in eliminating bus-pedestrian left-hand turn collisions by implementing "rigorous initiatives and technological innovations," *id.* ¶ 109.  The nature of the increase SEPTA's study revealed is not clear from the Amended Complaint, which alleges only that bus-pedestrian contacts involving New Flyer buses increased to 18.4% in 2010 and to 43.24% in 2011, without explaining what the increase is in relation to.  It is thus not clear whether the increase was in the number of contacts or in the proportion of contacts in relation to some other event.

acknowledge that transit bus operators might temporarily lose sight of pedestrians obstructed by the left side mirrors on the New Flyer buses. *See id.* ¶ 111.

In December 2011, a New Flyer bus struck a pedestrian while making a left-hand turn. *See id.* ¶ 112. The pedestrian sustained serious injuries in the collision requiring amputation of her left leg above the knee. *See id.* ¶ 113.

In 2012, a union official described the view obstruction caused by the driver's side mirror on the New Flyer buses at a union gathering believed to be attended by SEPTA representatives. *Id.* ¶ 114. That same year, SEPTA required transit bus operators "to undergo 'rock-n-roll' driving training" to account for the view obstruction during left hand turns. *See id.* ¶ 115.

In March 2013, a union official addressed the dangerous view obstruction the mirror system on New Flyer buses created during left-hand turns in a presentation to the Pennsylvania House of Representatives. *Id.* ¶ 117. At some point during that same year—it is not clear whether earlier or later—Defendant Michael Liberi, SEPTA's Chief Surface Transportation Officer, acknowledged that the model 715 mirror system mounted on New Flyer transit buses created an unreasonable obstruction of pedestrians during left-hand turns and committed to the union official that SEPTA would remove the mirror system.[11] *See id.* ¶¶ 118-19. In May 2013, due to an increase in the number of bus-pedestrian left-hand turn collisions, SEPTA retained STV Incorporated to study and evaluate use of the model 715F mirror system on SEPTA's fleet of over 1,400 buses. *See id.* ¶ 120.

---

[11] Liberi and other SEPTA managers and policymakers are also alleged to have been instructed by SEPTA to direct that the minutes of the monthly Local Safety Committee meetings omit any discussion of reports by New Flyer bus operators regarding the dangers associated with the Rosco model 715F mirror configuration, though it is not clear when or by whom such instructions were given. *See* Am. Compl. ¶ 127.

STV published its findings in January 2014, eight months before the accident in this case, concluding that the mirror system's configuration "obstructs a bus operator's view of the crosswalk to seventeen (17) feet when an operator starts a left hand turn movement at the traffic stop line" and that either lowering the mirror or reducing its size would dramatically increase the bus operators' field of vision during such turns. *Id.* ¶¶ 121-22. STV recommended that SEPTA implement these measures and change the mounting of the mirrors to make them more adjustable. *See id.* ¶¶ 123-24.

In December 2014, three months after the accident in this case, the Philadelphia City Council passed a resolution authorizing the Council's Committees on Transportation and Public Utilities and Public Safety to hold joint hearings concerning side mirror placement on SEPTA buses in Philadelphia. *Id.* ¶ 138. The resolution recounted, inter alia, the drivers' longstanding concerns about the blind spots the mirrors created; the amount SEPTA had paid to compensate victims of bus-pedestrian collisions, including left-hand turn knock-down accidents, in Philadelphia between 2011 and 2014; and the success other transit authorities in other cities had had in addressing similar issues. After the resolution was passed, SEPTA announced it would remove the model 715F mirror system from SEPTA's fleet of buses beginning in January 2015, allegedly in an effort to prevent the hearings from going forward.

In their 107-page Amended Complaint, Plaintiffs brings claims against the SEPTA Defendants, New Flyer, and Rosco under state and federal law.[12] Plaintiffs' federal claims are set forth in Counts XI-XV, in which Plaintiffs assert claims pursuant to 42 U.S.C. § 1983 against

---

[12] Plaintiffs commenced this action by filing a writ of summons in the Court of Common Pleas of Philadelphia County in August 2016. Plaintiffs filed their original Complaint on September 26, 2016, and sought leave to file an amended complaint two days later. The state court granted the motion for leave to amend on October 21, 2016, and SEPTA Defendants thereafter removed the case to federal court.

SEPTA (Count XI) and each of the individual SEPTA Executives (Counts XII-XV) for violations of White and K.W.'s Fourteenth Amendment substantive due process rights under both a state-created danger and a *Monell* theory of liability. In addition to their federal claims, Plaintiffs assert state law claims for negligence and negligent infliction of emotional distress against the SEPTA Defendants[13]; claims for negligent infliction of emotional distress, negligence, and strict liability (defective design and failure to warn) against New Flyer and Rosco; and claims for punitive damages against the SEPTA Executives, New Flyer, and Rosco. Plaintiffs assert both wrongful death and survival actions on behalf of White.

After removing this case from state to federal court, the SEPTA Defendants filed a partial motion to dismiss, seeking dismissal of Plaintiffs' "outside to the scope" claims, their § 1983 claims, and their claim for punitive damages against the SEPTA Executives. New Flyer and Rosco have also moved for partial dismissal of Plaintiffs' Amended Complaint. New Flyer seeks dismissal of all claims against New Flyer Canada for lack of personal jurisdiction and of Plaintiffs' claims for punitive damages and for negligent infliction of emotional distress against New Flyer America. Rosco also moves to dismiss Plaintiffs' claim for punitive damages. In addition, both New Flyer and Rosco seek to strike paragraphs 71-140 of the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(f). Plaintiffs oppose the motions.

---

[13] Because, as an "agency and instrumentality" of the Commonwealth of Pennsylvania, SEPTA and its "members, officers, officials and employees" enjoy sovereign and official immunity from suit, subject to the exceptions set forth in Pa. Cons. Stat. Ann. §§ 8501-8528, *see* 74 Pa. Cons. Stat. Ann. § 1711(a), (c)(3), Plaintiffs have framed their negligence claims against SEPTA and the SEPTA Executives, and their negligent infliction of emotional distress claims against McGill and SEPTA, as claims for negligence "acting outside to the scope of 74 Pa.C.S.A. § 1741." The SEPTA Defendants also construe Plaintiffs' negligent infliction of emotional distress claim against the SEPTA Executives as an "acting outside to the scope" claim.

**DISCUSSION**

To withstand a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the facts pleaded "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In evaluating a Rule 12(b)(6) motion, a district court first must separate the legal and factual elements of the plaintiff's claims. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). The court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* at 210-11. The court must then "determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679).

"To state a claim under 42 U.S.C. § 1983, a plaintiff must allege a person acting under color of state law engaged in conduct that violated a right protected by the Constitution or laws of the United States." *Morrow v. Balaski*, 719 F.3d 160, 165-66 (3d Cir. 2013) (en banc). In evaluating a § 1983 claim, a court must first "identify the exact contours of the underlying right said to have been violated." *Id.* at 166 (quoting *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000) (en banc)). The court must then "determine whether the plaintiff has alleged a deprivation of a constitutional right at all." *Id.* (quoting *Nicini*, 212 F.3d at 806) (internal quotation marks omitted).

The § 1983 claims in this case allege violations of White and K.W.'s Fourteenth Amendment due process rights. The Due Process Clause prohibits a state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

Plaintiffs invoke the substantive component of the Due Process Clause, which "limits what government may do regardless of the fairness of procedures that it employs," *Evans v. Sec'y Pa. Dep't of Corr.*, 645 F.3d 650, 659 (3d Cir. 2011) (citation omitted), protecting against "government power arbitrarily and oppressively exercised," *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). The Supreme Court has emphasized that where, as here, executive action is at issue, "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Id.* (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 129 (1992)). Executive action violates the substantive component of the Due Process Clause only when it is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at 847 n.8.

To establish a substantive due process claim, a plaintiff must allege (1) a state actor deprived him or her of an interest protected by the substantive due process clause and (2) the "deprivation of that protected interest shocks the conscience." *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008). Although Plaintiffs do not specifically identify the particular substantive due process interest or interests at stake, the interests protected by substantive due process include life and bodily integrity, both of which are implicated here. *See Lewis*, 523 U.S. at 840 (life); *Ziccardi v. City of Phila.*, 288 F.3d 57, 60 (3d Cir. 2002) (liberty interest in bodily integrity). Notably, the SEPTA Defendants do not suggest a constitutionally protected interest is lacking here.

Plaintiffs seek to pursue substantive due process claims against SEPTA and the SEPTA Executives under two independent theories. *See* Pls.' Opp'n to SEPTA Defs.' Mot. to Dismiss 7. First, Plaintiffs assert these Defendants are liable under the state-created danger theory, alleging that SEPTA and the SEPTA Executives increased the risk of injury to White and K.W. by

placing the New Flyer bus that struck them into service on the day of the accident, knowing that the configuration of the driver's side mirror created a dangerous view obstruction. *See id.* Second, Plaintiffs assert a *Monell* claim against SEPTA and the SEPTA Executives based on an alleged policy, custom, or practice at SEPTA—created or acquiesced in by the SEPTA Executives—which disregarded the obvious and known danger that the configuration of the Rosco model 715F mirrors on New Flyer buses posed to pedestrians during left-hand turns, and "reflected a deliberate indifference to [White and K.W.'s] constitutional rights." *See id.* at 7-8.[14]

A.      **State-Created Danger Claim**

The state-created danger theory provides an exception to the general rule that "the Due Process Clause does not impose an affirmative obligation on the state to protect its citizens" in situations where the state "affirmatively creates or enhances a risk of danger." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 431 (3d Cir. 2006). To successfully plead a state-created danger claim, a plaintiff must allege four elements:

---

[14] As noted, Plaintiffs' § 1983 claims are set forth in Counts XI-XV of the Amended Complaint. Count XI, Plaintiffs' § 1983 claim against SEPTA, is divided into two sections, one captioned "State Created Danger Theory of Liability" and one captioned "Monell Theory of Liability." Am. Compl. at 53, 57. Counts XII-XV, Plaintiffs' § 1983 claims against the individual SEPTA Executives, are also each divided into two sections, one captioned "Direct Constitutional Violation and Supervisor Liability" and one captioned "Monell Theory of Liability." *E.g.*, Am. Compl. at 62, 66 (Deon). Based on Plaintiffs' argument in their opposition to the SEPTA Defendants' partial motion to dismiss, the Court understands the "Direct Constitutional Violation and Supervisor Liability" claims against the individual SEPTA Executives to be state-created danger claims. *See* Pls.' Opp'n to SEPTA Defs.' Mot. for Partial Dismissal 7 (describing the first theory of § 1983 liability alleged in the Amended Complaint as alleging that "the affirmative and direct acts of the SEPTA defendants violated Section 1983 as a result of the SEPTA defendants having knowingly created a danger to the plaintiffs and acting with a deliberate indifference to that state-created danger"); *id.* at 16 (arguing the SEPTA Defendants' motion to dismiss Counts XI-XV should be denied because those counts sufficiently plead the elements of a state-created danger claim). In addition, because Plaintiffs assert both state-created danger and *Monell* claims against SEPTA, the Court understands Plaintiffs' *Monell* claims against all Defendants to be direct (i.e., non-state-created danger) substantive due process claims.

1. the harm ultimately caused was foreseeable and fairly direct;

2. a state actor acted with a degree of culpability that shocks the conscience;

3. a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

4. a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*L.R. v. Sch. Dist. of Phila.*, 836 F.3d 235, 242 (3d Cir. 2015) (quoting *Bright v. Westmoreland Cty.*, 443 F.3d 276, 281 (3d Cir. 2006)). The SEPTA Defendants concede Plaintiffs have sufficiently alleged the first element of a state-created danger claim, but argue they have failed to allege the remaining three elements. The Court agrees.

The Court turns first to the third element, which is concerned with whether the plaintiff was a foreseeable victim of the particular danger the state is alleged to have created. Although this element does not "always require[] knowledge that a specific individual has been placed in harm's way," the plaintiff must, at a minimum, be "part of an identifiable and discrete class of persons subject to the harm the state allegedly has created." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 914 (3d Cir. 1997); *see also Kaucher*, 455 F.3d at 432 n.8. This element is not satisfied "[w]here the state actor has allegedly created a danger towards the public generally, rather than an individual or group of individuals," as "holding a state actor liable for the injuries of foreseeable plaintiffs [in these circumstances] would expand the scope of the state-created danger theory beyond its useful and intended limits." *Morse*, 132 F.3d at 913 n.12.

Plaintiffs argue this element is satisfied because the Amended Complaint alleges the configuration of the driver's side Rosco Model 715F mirrors on New Flyer buses presented an increased risk of harm to a "sufficiently discrete" class of persons of which White and K.W.

were members—namely, "pedestrians crossing in crosswalks in the same direction of travel as a left-hand turning SEPTA bus." Pls.' Opp'n to SEPTA Defs.' Mot. for Partial Dismissal 13-14. In Plaintiffs' view, because the mirror configuration poses a danger to only a subset of pedestrians, and not to the public at large, that subset qualifies as an "identifiable and discrete" class of persons subject to the harm in question. The Court disagrees.

By Plaintiffs' account, the mirror configuration poses a risk of harm to *any* pedestrian crossing a street in a crosswalk in the same direction of travel as a left-hand turning New Flyer bus along *any* bus route. While Plaintiffs assert the immediate threat of harm presented by the mirror configuration is limited in scope and duration in that the mirrors cause a view obstruction only briefly during any individual left-hand turning motion, *see id.* at 14, this momentary risk potentially recurs during every left-hand turn along every bus route serviced by a New Flyer bus equipped with a Rosco model 715F mirror. The overall risk of harm from the mirror configuration is thus limited neither in scope nor in duration, but is diffuse, existing whenever— and wherever—buses with the view-obstructing mirrors are in service. In *Solum v. Yerusalim*, another court in this district rejected the argument that drivers along a particularly dangerous stretch of highway where more than 1,000 accidents had been reported constituted an identifiable and discrete class, given the "unquantifiable and virtually unidentifiable mass of potential plaintiffs" such a class would contain. No. 98-4056, 1999 WL 395720, at *5 (E.D. Pa. June 17, 1999), *aff'd*, 211 F.3d 1261 (3d Cir. 2000) (unpublished table disposition); *see also Stover v. Camp*, 181 F. App'x 305, 308 (3d Cir. 2006) (holding a group of persons who regularly traveled on a dangerous stretch of road "hardly constitutes a 'discrete class of persons subjected to the potential harm' that [plaintiffs] suffered"); *Crockett v. SEPTA*, No. 12-4230, 2013 WL 2983117, at *7 (E.D. Pa. June 14, 2013) (holding a group composed of SEPTA regional rail passengers,

14

who were exposed to a risk of injury from defective trap doors on the railcars, was "too vast in size to constitute a discrete class"), *aff'd on other grounds*, 591 F. App'x 65 (3d Cir. 2015). That conclusion applies equally here, as the group of potential accident victims in this case is no more quantifiable or identifiable than in *Solum*.

This case is also readily distinguishable from *Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993), on which Plaintiffs primarily rely. *Reed* involved a state-created danger claim against police officers who arrested the driver of a car, leaving a drunk passenger behind with the car keys. Following the officers' intervention, the passenger drove away in the car and collided head on with another vehicle, injuring the vehicle's six occupants, one fatally. Reversing the dismissal of the occupants' state-created danger claim against the officers who left the car in the custody of the drunk passenger, the Seventh Circuit observed that the victims of the crash were sufficiently foreseeable to hold the officers accountable, noting the immediate threat of harm had "a limited range and duration," affecting only other motorists on the same highway within two hours of the officers' intervention. *Id.* at 1127. Here, in contrast, the group of persons potentially subject to the risk of harm from the mirror configuration on the New Flyer buses is not similarly limited.[15]

---

[15] In *Morse*, the Third Circuit cited the decision in *Reed* as "illustrative" of cases in which courts "have applied the state-created danger theory . . . [to] h[o]ld state actors liable for creating a risk to a definable class of persons," rather than limiting the theory to only those instances where a specific individual is placed in danger. 132 F.3d at 913. The Court of Appeals did not expressly adopt the reasoning in *Reed*, ultimately declining to resolve whether the particular class of persons at issue in the case before it—all those present in a high school when an intruder entered the building and shot a teacher—was sufficiently discrete and identifiable to satisfy the third element of a state-created danger claim. *See id.* at 914. Other courts have rejected the notion that drivers in a particular area in a particular time frame constitute a discrete group of individuals. *See Koulta v. Merciez*, 477 F.3d 442, 447 (6th Cir. 2007) (rejecting the argument that the group of all individuals driving on the streets between a house police ordered a drunk woman to leave and the woman's own home was a discrete class where the court "ha[d] no idea how many people would be in this group").

The only other case cited by Plaintiffs with respect to the third element of the state-created danger test is *Hall v. SEPTA*, a case which Plaintiffs contend resulted in a $51 million jury verdict in the Court of Common Pleas of Philadelphia County on a state-created danger claim by a four-year-old boy whose foot had to be amputated after it became caught in an escalator operated by SEPTA.  *See* Pls.' Opp'n to SEPTA Defs.' Mot. for Partial Dismissal 14 n.27, 24.  Although Plaintiffs characterize the case as holding that, as a rider of the dangerous escalator in question, the minor plaintiff was a member of an identifiable and discrete class, *see id.* at 14 n.27, they cite no written decision to this effect and the Court has not found one.  In any event, the risk of harm posed by the mirror configuration of the New Flyer buses is significantly more diffuse than that posed by a single fixed escalator.

Because the class of persons at risk of harm from left-hand-turning New Flyer buses is neither identifiable nor discrete, the Amended Complaint fails to allege the third element of a state-created danger claim.

Nor have Plaintiffs sufficiently alleged the final element of their state-created danger claim, which "asks whether the state's conduct created or increased the risk of danger to the plaintiff." *L.R.*, 836 F.3d at 242.  In defining the contours of the state-created danger theory, the Third Circuit has repeatedly stressed that "[i]t is misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause."  *See, e.g.*, *id.* (quoting *Bright*, 443 F.3d at 282). To satisfy the fourth element of the state-created danger test, there must be "a specific and deliberate exercise of state authority," and the affirmative exercise of state authority must have a "direct causal relationship" to the plaintiff's harm.  *Kaucher*, 455 F.3d at 432.

Although analysis of the fourth element often focuses on whether the harm that befell the plaintiff was the result of an affirmative act by a state actor or a failure to act, the Third Circuit

has recognized the inherent difficulty in drawing a line between action and inaction. *See, e.g.*, *L.R.*, 836 F.3d at 242. In light of this difficulty, the Court of Appeals in *L.R.* suggested an alternative approach to determining whether this element is satisfied:

> Rather than approach this inquiry as a choice between an act and an omission, we find it useful to first evaluate the setting or the "status quo" of the environment before the alleged act or omission occurred, and then to ask whether the state actor's exercise of authority resulted in a departure from that status quo.

*Id.* at 243.

Applying this approach, the Court in *L.R.* found the fourth element was sufficiently pled based on allegations that a state actor (a kindergarten teacher) had released one of his students to an adult who refused to provide identification (and who later sexually assaulted the child off of school grounds). *See id.* at 242-44. The Court first observed that the status quo in the case was "a typical kindergarten classroom," a setting in which children are closely supervised by a teacher who restricts their freedom of movement, acting as a "gatekeeper for very young children who are unable to make reasoned decisions about when and with whom to leave the classroom." *Id.* at 243. In this setting, the child would have been "safe in her classroom unless and until her teacher . . . permitted her to leave." *Id.* Given the nature of the classroom environment and the teacher's gatekeeping role in that environment, the Court had no difficulty concluding the teacher's actions—asking the adult who retrieved the child for proper identification and verification and then permitting the child to leave with her despite her failure to produce either— "resulted in a drastic change to the classroom status quo, not a maintenance of a situation that was already dangerous." *Id.* at 244. The Court thus held that the teacher's use of his gatekeeping authority to release the child to an unidentified adult amounted to an affirmative misuse of state authority that created or increased the danger to the child. *See id.*

In arguing they have sufficiently alleged the fourth element of their state-created danger claim in this case, Plaintiffs' urge this Court to follow the approach taken by the Third Circuit in *L.R.* In Plaintiffs view, the status quo in this case consists of the intersection just prior to the accident, with White and K.W. on the curb and a SEPTA bus in the road, all traveling in the same direction and waiting for the light to change. Plaintiffs posit that, in this setting, White and K.W. "presumably are safe from the danger of being struck by the SEPTA transit bus during the [bus's] negotiation of a left hand turn, so long as their crossing of the intersection is guided by the traffic control signal and the SEPTA transit bus operator's vision of them during a left hand turning movement is not dangerously obstructed." Pls.' Opp'n to SEPTA Defs.' Partial Mot. to Dismiss 16. Plaintiffs then argue the SEPTA Defendants changed the status quo by exercising their authority to place a New Flyer bus with a Rosco model 715F mirror mounted on the front driver's side into service on the day of the accident,[16] thereby increasing the risk that White and K.W. would be harmed as a result of a left-hand turn bus-pedestrian collision. *See id.*

Plaintiffs' framing of this issue is unpersuasive. While Plaintiffs argue the SEPTA Defendants changed the status quo by placing a New Flyer bus with a Rosco model 715F mirror into service on September 26, 2014, the Complaint alleges such buses were the status quo as early as 2003, when SEPTA contracted with New Flyer to purchase them. *See* Am. Compl. ¶¶ 28-31. Indeed, it is SEPTA's years of experience with New Flyer buses equipped with driver's side Rosco model 715F mirrors, during which time evidence of the risk of harm the mirror configuration posed to pedestrians during left-hand turns accumulated, that is the basis for

---

[16] The Amended Complaint alleges the New Flyer bus that struck White and K.W. was placed into service on the day of the accident as a result of each of the SEPTA Executives' exercise of his executive power to direct that the bus be placed into service, to ratify or acquiesce in a decision to place the bus into service, or to direct others to place the bus into service. *See* Compl. ¶¶ 304-08 (Deon), ¶¶ 335-39 (Casey), ¶¶ 366-70 (Sauer), ¶¶ 397-401 (Liberi).

Plaintiffs' allegation that the SEPTA Defendants acted with deliberate indifference. *See* Pls.' Opp'n to SEPTA Defs.' Partial Mot. to Dismiss 12; Am. Compl. ¶¶ 72-127. Because the New Flyer buses with Rosco model 715F mirrors—including the bus involved in the accident in this case—had long been in service at the time the accident, the continued use of such buses amounted to "maintenance of a situation that was already dangerous" to pedestrians, not a change in the status quo. *See L.R.*, 836 F.3d at 244.[17]

Consideration of the status quo in the circumstances of this case thus underscores that the case is fundamentally about the SEPTA Defendants' failure to exercise their authority to address the known hazard posed by the driver's side mirror configuration, not an alleged decision to place the particular bus in question on the date of the accident. The Third Circuit and district courts within the Third Circuit have repeatedly held similar failures to remedy known dangerous conditions do not constitute the affirmative use of state authority necessary to plead a state-created danger claim, despite plaintiffs' efforts to characterize them as such.

In *Searles v. SEPTA*, for example, a SEPTA passenger was fatally injured when the elevated railcar in which he was riding struck a pillar that separated two different tracks. 990 F.2d 789, 790 (3d Cir. 1993). The accident occurred after a motor fell from the bottom of a moving railcar and struck a switch, causing the rear wheels of the car in which the decedent was riding to go on a different track than the front wheels. *See id.* The decedent's wife sought to

---

[17] At a minimum, buses equipped with Rosco model 715F driver's side mirrors were the status quo at the time of the accident in this case. *See* Am. Compl. ¶ 120 (alleging that as of May 2013, when SEPTA retained STV to study and evaluate the Rosco model 715F mirrors, the mirror system was "installed and in use as the driver's side mirror on SEPTA's fleet of over 1,400 buses"). While Plaintiffs appear to suggest that SEPTA changed the status quo by choosing to place a bus with a model 715F mirror into service on the day of the accident, rather than choosing a different bus without a view obstruction, *see* Pls.' Opp'n to SEPTA Defs.' Mot. for Partial Dismissal 16, the Amended Complaint contains no factual support for the proposition that SEPTA had such a choice.

hold SEPTA and various SEPTA employees and officials liable for violating her husband's substantive due process rights, arguing, inter alia, that defendants had created a danger to her husband by adopting and following a grossly negligent maintenance program which the defendants knew or should have known posed a risk to rider safety. *See id.* at 792-93. The Third Circuit rejected this argument, observing that the "fundamental cause of the danger" to the decedent was not "a state actor's affirmative act in the traditional sense," but a failure to act—namely, the failure to maintain the railcars in a safe operating condition. *See id.* at 793.[18]

A similar effort to recast a failure by SEPTA and SEPTA officials to remedy a known defect in railcars on SEPTA's regional rail was also rejected in *Crockett v. SEPTA*, No. 12-4230, 2013 WL 2983117 (E.D. Pa. June 14, 2013). The plaintiff in *Crockett*, a regional rail passenger, was injured when a trap door covering a retractable stair system in the railcar in which he was traveling violently sprang open, struck the plaintiff's leg, and slammed down on his foot. *See id.* at *1. Although SEPTA had long been aware of the defect in its trap doors, which had injured numerous other passengers, SEPTA failed to fix the problem and instead allegedly took steps to make its trains less safe by deciding to forego daily inspections of the trap doors. *See id.* at *1-2. The plaintiff argued that by adopting a policy to forego daily inspections of the trap doors, SEPTA and its officials had acted affirmatively to increase the risk of harm to passengers. *Id.* at *8. Citing *Searles*, the court rejected this argument, holding the decision to forego daily inspections was, at bottom, a decision to forego exercising state authority that "constitute[d]

---

[18] Although *Searles* was decided before the Third Circuit definitively accepted the state-created danger theory as a viable mechanism for finding a constitutional injury, the Court of Appeals considered the viability of the plaintiff's claim under that theory and found it lacking for failure to allege affirmative action. *See Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir. 1995) (characterizing *Searles* as holding that "even assuming the viability of the [state-created danger] theory, the facts of the case did not fall within its purview").

inaction, rather than action." *Id.* at *8-9. A panel of the Third Circuit affirmed, agreeing that forgoing daily inspections was, in essence, "passive inertia, resulting in nothing being done" and therefore "f[e]ll[] short of an 'affirmative act in the traditional sense.'" *Crockett*, 591 F. App'x at 67 (quoting *Searles*, 990 F.2d at 793).

Finally, in *Meza v. SEPTA*, another court in this district dismissed a state-created danger claim regarding the same dangerous driver's side mirror system at issue in this case, rejecting the plaintiff's attempts to frame SEPTA's failure to remedy a known hazard associated with the mirror systems as an affirmative decision to use a dangerous mirror. Order 2 n.1, Civ. No. 13-7139 (E.D. Pa. Mar. 14, 2014).

The SEPTA Defendants' alleged decision to allow the New Flyer buses with Rosco model 715F mirrors to remain in service rather than taking the buses out of service and correcting the view obstruction is the same kind of passive inaction present in *Crockett* and *Meza*. The Court therefore concludes Plaintiffs have not sufficiently alleged the fourth element of their state-created danger claim. Because the Amended Complaint does not allege all of the required elements of a state-created danger claim, Counts XI-XV will be dismissed insofar as they are based on the state-created danger theory.[19]

**B.** *Monell* **Claims**

Plaintiffs also seek to pursue substantive due process claims against SEPTA and the SEPTA Executives based on a *Monell* theory of liability. Under *Monell v. Department of Social*

---

[19] The Court also finds the Amended Complaint fails to allege the SEPTA Executives' failure to replace the mirrors was conscience shocking—the second element of a state-created danger claim—for the reasons explained in the discussion of Plaintiffs' *Monell* claims below.

*Services*, a local government[20] may be held liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," causes the violation of a constitutional right. 436 U.S. 658, 694 (1976). To establish a *Monell* claim, a plaintiff must show that a municipal policy or custom was the moving force behind the constitutional violation. *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). "Policy is made when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990) (alteration in original) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)). Government custom may be established based on practices of state officials that, while not authorized by law, are "'so permanent and well settled' as to virtually constitute law." *Id.* (quoting *Monell*, 436 U.S. at 690).

A plaintiff may establish *Monell* liability by showing that a policymaker is responsible "either for the policy or, through acquiescence, for the custom." *Id.* (quoting *Pembaur*, 475 U.S. at 481). At the pleading stage, the plaintiff must "identify a custom or policy, and specify what exactly that custom or policy was," and must "allege conduct by a municipal decisionmaker." *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009). Individual defendants who are policymakers may be liable under § 1983 if, "with deliberate indifference to the consequences, [they] established and maintained a policy, practice or custom which directly caused [the plaintiff's] constitutional harm." *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989).

---

[20] Although as a metropolitan transportation authority, SEPTA "exercise[s] the public powers of the Commonwealth [of Pennsylvania] as an agency and instrumentality thereof," 74 Pa. Cons. Stat. Ann. § 1711(a), SEPTA is treated as a municipal agency for purposes of § 1983 liability, *see Brown v. SEPTA*, 539 F. App'x 25, 27 (3d Cir. 2013); *Bolden v. SEPTA*, 953 F.2d 807, 821 n.22, 830 (3d Cir. 1991) (en banc).

Given the breadth of the allegations supporting Plaintiffs' *Monell* claims, which occupy more than 15 pages of the Amended Complaint, the basis of those claims is somewhat difficult to decipher. Although the Amended Complaint identifies various alleged policies, customs, and practices,[21] in their opposition to the SEPTA Defendants' motion for partial dismissal, Plaintiffs assert the "essence" of their *Monell* claims against SEPTA and the SEPTA Executives "is that SEPTA and its supervisors created or acquiesced to a custom and practice which disregarded the real and documented danger which the New Flyer transit buses equipped with the Rosco mirror system presented to pedestrians during left hand turning movements." Pls.' Opp'n to SEPTA Defs.' Mot. to Dismiss 20.

The SEPTA Defendants argue Plaintiffs' *Monell* claims should be dismissed because Plaintiffs have not sufficiently identified the policy or custom that caused their injuries and

---

[21] In addition to alleging SEPTA had a policy, custom, or practice of "disregard[ing] the obvious and known danger" the view obstruction associated with the Rosco model 715F mirror system posed to pedestrians, Am. Compl. ¶ 269, the Amended Complaint alleges SEPTA had a policy, custom, or practice of systematically denying that the mirror configuration on the New Flyer buses created an unreasonable risk of harm to pedestrians during left-hand turns, *id.* ¶ 272; systematically assigning operator error and pedestrian fault as the cause of bus-pedestrian collisions during left-hand turns, despite the existence of objective evidence to the contrary, and initiating disciplinary actions against bus operators involved in such collisions, *id.* ¶¶ 275, 284; concealing the danger posed by the mirror configuration from the public by directing that driver reports about the view obstruction not be included in Local Safety Committee meeting minutes, *id.* ¶ 278; and systematically refusing to implement strategies known to effectively mitigate or eliminate left-hand turn bus-pedestrian collisions or otherwise to take effective action to prevent the foreseeable harm caused by the mirror configuration, *id.* ¶¶ 281, 288.

Plaintiffs' *Monell* allegations against the SEPTA Executives also make reference to the Executives' failure to supervise, discipline, and/or sanction unidentified subordinates who "were aware of but disregarded the obvious and known danger" the Rosco mirrors posed to pedestrians, *id.* ¶ 316; placed New Flyer buses equipped with Rosco mirrors into service, *id.* ¶ 318; acted to conceal the known danger presented by the mirror configuration, *id.* ¶ 321; and "improperly and systematically assigned operator error and pedestrian fault as the cause of pedestrian-bus left turn knock down accident and near miss events," *id.* ¶¶ 323-34. Plaintiffs further allege the SEPTA Executives failed to adequately train or equip "SEPTA safety operation employees" to "implement effective strategies to eliminate left-hand turn knock down or near miss events," *id.* ¶¶ 319-20, but do not further identify such employees or their role at SEPTA.

because they have not alleged an underlying violation of White and K.W.'s substantive due process rights. The SEPTA Defendants also argue that insofar as Plaintiffs' *Monell* claims are brought against the SEPTA Executives in their individual capacities, the claims are barred by qualified immunity.

The starting point for the Court's analysis of whether Plaintiffs have alleged a violation of White and K.W.'s substantive due process rights, independent of the state-created danger theory, is *Collins v. City of Harker Heights*, 503 U.S. 115 (1992). *Collins* involved a suit by the widow of a municipal employee who died of asphyxia after entering a manhole to unstop a sewer line. After her husband's death, the plaintiff brought a § 1983 action against the city for violating her husband's substantive due process right to life and liberty by following a "custom and policy of not training its employees about the dangers of working in sewer lines and manholes, not providing safety equipment at jobsites, and not providing safety warnings." *Id.* at 117. The city allegedly was aware of the risks of entering the sewer line based on a prior incident in which a supervisor had been rendered unconscious in a manhole, and had "systematically and intentionally failed to provide the equipment and training required by a Texas statute." *Id.* at 117-18.

Addressing whether the plaintiff had alleged a constitutional violation,[22] the Supreme Court construed the complaint as advancing two theories: (1) "that the Federal Constitution imposes a duty on the city to provide its employees with minimal levels of safety and security in the workplace," and (2) "that the city's 'deliberate indifference' to [the decedent's] safety was arbitrary government action that must 'shock the conscience' of federal judges." *Id.* at 126. The

---

[22] The Court assumed for purposes of its opinion that the complaint sufficiently alleged a basis for municipal liability under *Monell*. *See Collins*, 503 U.S. at 124.

Court held the plaintiff had failed to allege a substantive due process violation under either theory.

The Court rejected the first theory as unsupported by either the text or the history of the Due Process Clause, which "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *Id.* at 126 (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989)). While the Due Process Clause imposes an obligation on the State to satisfy certain minimal custodial standards when it deprives a person of his or her liberty, no such obligation arises in the public employment context, as a city's offer of employment does not involve a similar deprivation of liberty. *See id.* at 127-28.

As to the second theory, stressing that the Due Process Clause should not "be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law," the Court held the plaintiff's allegations regarding the city's "failure to train its employees, or to warn them about known risks of harm" could not "properly be characterized as arbitrary, or conscience shocking, in a constitutional sense," but rather were more closely analogous to "a fairly typical state-law tort claim." *Id.* at 128. In so holding, the Court explained that its refusal to characterize the city's omission as conscience-shocking "rest[ed] on the presumption that the administration of government programs is based on a rational decisionmaking process that takes account of competing social, political, and economic forces." *Id.* Noting that "[d]ecisions concerning the allocation of resources to individual programs, such as sewer maintenance, and to particular aspects of those programs, such as the training and compensation of employees, involve a host of policy choices," the Court reasoned such choices "must be made by locally elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country." *Id.* at 128-29. The Court also stressed that the Due Process

Clause does not "guarantee municipal employees a workplace that is free of unreasonable risks of harm." *Id.* at 129.

Since *Collins* was decided, the Third Circuit has held that just as the Due Process Clause does not impose a duty on a government employer to provide its employees with a safe work environment, it also does not impose a duty on a government transportation authority—i.e., SEPTA—to provide riders with a safe passenger environment. *See Searles*, 990 F.2d at 792. *Collins* and *Searles* thus foreclose any argument that the Due Process Clause imposes a duty on SEPTA to provide a safe environment for pedestrians, who are even further removed from a custodial environment than transit passengers. *See id.* (noting passengers are not deprived of liberty when they voluntarily choose to ride public transportation).[23]

Yet despite the Supreme Court's rejection of the plaintiff's substantive due process claim in *Collins*, the Third Circuit has also reaffirmed that a plaintiff may state a claim for a substantive due process violation by alleging conduct by a government actor (including a government employer) that "satisfies the demanding shocks the conscience test." *Eddy v. V.I. Water & Power Auth.*, 256 F.3d 204, 212-13 (3d Cir. 2001) (holding a government official was not entitled to qualified immunity from a substantive due process claim by an employee who had been ordered to replace a switch on a live high voltage line, under threat of termination, without

---

[23] As discussed above, *Searles* involved a suit by the widow of a SEPTA passenger who was killed in a derailment after a defect in the railcar in which he was traveling went undetected in numerous inspections, allegedly due to SEPTA's policy or custom of following a grossly negligent maintenance, inspection, and repair program. *See* 990 F.2d at 790. In addition to rejecting the plaintiff's substantive due process claim based on SEPTA's violation of an alleged constitutional duty to provide passengers with minimal levels of safety and security during transportation, the Third Circuit also rejected the plaintiff's claim that SEPTA's adoption of the grossly negligent maintenance program, despite knowing of the risk to the safety of its riders, amounted to the kind of conscience-shocking government conduct necessary to establish a substantive due process violation. *See id.* at 792-93.

proper clothing, tools, or equipment, such that the employee "face[d] a risk of almost certain injury if he performed the work" and, in fact, suffered serious burns when his wrench slipped during the task); *see also Ziccardi*, 288 F.3d at 60, 66 (holding paramedics who allegedly rendered the decedent a quadriplegic by lifting him improperly after he had sustained a spinal injury could be liable for violating the decedent's substantive due process interest in bodily integrity if the plaintiff showed that, knowing the decedent was injured, the paramedics consciously disregarded a great risk that serious harm would result if they moved the decedent without support for his back and neck).

The exact level of culpability required to meet the shocks the conscience test is context-dependent, varying based on "the state actor's opportunity to deliberate before taking action." *Kedra v. Schroeter*, 876 F.3d 424, 437 (3d Cir. 2017). Where a state actor confronts a "'hyperpressurized environment[] requiring a snap judgment,' [the] official must actually intend to cause harm in order to be liable." *Id.* (quoting *Vargas v. City of Phila.*, 783 F.3d 962, 973 (3d Cir. 2015)). Where a state actor "is required to act 'in a matter of hours or minutes,'" in contrast, liability may be imposed if the actor "disregard[ed] a great risk of serious harm." *Id.* (quoting *Sanford v. Stiles*, 456 F.3d 298, 310 (3d Cir. 2006) (per curiam)). And where the circumstances allow the exercise of "unhurried judgment[]," the applicable mental state is one of "deliberate indifference." *Id.* (alteration in original) (quoting *Sanford*, 456 F.3d at 310). The parties agree this case falls into this last category, such that deliberate indifference is the applicable standard. *See* SEPTA Defs.' Mot. for Partial Dismissal 10; Pls.' Opp'n to SEPTA Defs.' Mot. for Partial Dismissal 11.

The Third Circuit has long recognized that the deliberate indifference standard may be satisfied in the substantive due process context if a state actor "conscious[ly] disregard[s] . . . a

substantial risk of serious harm." *Kedra*, 876 F.3d at 437, 447 (quoting *Vargas*, 783 F.3d at 973-74). More recently, the Third Circuit has also held "deliberate indifference might exist without actual knowledge of a risk of harm when the risk is so obvious that it should be known." *Id.* at 439 (quoting *L.R.*, 836 F.3d at 246). Plaintiffs argue both standards are satisfied here. Plaintiffs contend the Amended Complaint adequately pleads subjective deliberate indifference by alleging facts showing that SEPTA and the SEPTA Executives appreciated the risk of harm the mirror configuration on the New Flyer buses posed to pedestrians but chose not to implement strategies known to effectively mitigate or eliminate left turn bus-pedestrian collisions, instead keeping the buses in operation. *See* Pls.' Opp'n to SEPTA Defs.' Mot. for Partial Dismissal 12, 21. Plaintiffs further argue the risk of harm to pedestrians from placing a transit bus with a large blind spot into service in an urban environment is sufficiently obvious "that the action of placing the transit bus into operation, on its face, rises to [the] level of deliberate indifference." *Id.* at 12.

Viewing the facts in the light most favorable to Plaintiffs, the Amended Complaint provides ample basis to infer that, at the time the accident at issue in this case occurred in September 2014, SEPTA officials knew the mirrors on the New Flyer buses created a blind spot for drivers during left-hand turning movements, and knew the blind spot posed a risk of harm to pedestrians during such movements.[24] Yet the Amended Complaint also alleges that SEPTA

---

[24] It is not clear that the facts alleged the Amended Complaint support the inference that SEPTA officials knew or should have known that the mirror configuration on the New Flyer buses posed a substantial risk of serious harm to pedestrians. The Amended Complaint alleges that New Flyer buses equipped with Rosco model 715F mirrors were involved in some number of collisions with pedestrians over the approximately eleven-year period preceding the accident in this case, three of which resulted in pedestrian fatalities and one of which resulted in injuries to the pedestrian necessitating a partial leg amputation. The fact that these fatalities occurred, while indicative of the seriousness of the harm a bus-pedestrian collision may cause, does not, without more, support the inference that the mirror configuration posed a substantial risk of such harm. Some risk of bus-pedestrian collisions, and of fatalities resulting from such collisions, is inherent in a bus transportation system in an urban setting. *Cf. United States v. Bernardo*, 818 F.3d 983,

took steps to address the risks associated with the mirrors.  In 2004, after two New Flyer buses equipped with Rosco model 715F mirrors struck and killed pedestrians during left-hand turning movements, SEPTA investigated both incidents and conducted a reenactment of the second accident which confirmed the existence of a view obstruction during left hand turns.  Following the reenactment, SEPTA issued a six-page training bulletin, advising bus operators that the mirrors on the New Flyer buses could cause a view obstruction and instructing operators to lean forward or around in the driver's seat "to gain a better sight angle" so as to "minimize the obstruction caused by the mirror."  Am. Compl. ¶ 88.  In 2012, after bus-pedestrian collisions involving left-hand-turning New Flyer buses resulted in one additional fatality and serious injuries to another pedestrian, SEPTA required transit bus operators to undergo "'rock-n-roll' driver training" to account for the view obstruction the mirrors created during left-hand turns. *Id.* ¶ 115.  And in May 2013, because of an increase in the number of bus-pedestrian left-hand turn collisions, SEPTA retained STV to study and evaluate the Rosco model 715F mirror system installed on SEPTA's fleet of more than 1,400 buses.  In January 2014, STV issued a report recommending that SEPTA implement measures to reduce the size of the blind spot on the New Flyer buses.  SEPTA eventually committed to removing the Rosco model 715F mirrors, though not until almost a year later, after the City Council resolved to hold hearings concerning side mirror placement on SEPTA buses.

---

986 (9th Cir. 2016) (recognizing there is a "baseline risk" of death or injury "inherent in all vehicular travel").  Indeed, the Amended Complaint acknowledges as much, alleging that 50% of the bus-pedestrian contacts involving New Flyer buses between 2007 and 2011 did *not* occur during left-hand turns, Am. Compl. ¶ 108, and referring to three pedestrian fatalities resulting from accidents with SEPTA buses in 2012, none of which is alleged to have occurred during a left-hand turn, *see id.* ¶ 132.  Absent some information on the baseline risk to pedestrians from buses—or during left-hand turns—it is difficult to say whether the risk of harm attributable to the configuration of the Rosco mirrors was substantial.

Plaintiffs challenge the adequacy of SEPTA's response to the risks associated with the mirror configuration, faulting SEPTA for failing to "implement strategies known to effectively mitigate or eliminate left-turn pedestrian-bus collisions," Am. Compl. ¶ 281, and to take "effective action" to prevent pedestrians from being harmed as a result of the mirror configuration, *see id.* ¶ 288.  But these decisions concerning the allocation of resources to particular aspects of the public transportation system are precisely the kind of policy choices the federal courts have been loath to second guess under the guise of substantive due process.  *See, e.g.*, *Schroder v. City of Fort Thomas*, 412 F.3d 724, 729-30 (6th Cir. 2005) (holding a city's failure to lower the speed limit on a residential street despite residents' warnings about speeding traffic using the street as a "cut-through," was not conscience shocking, as "[i]t is in the very nature of deliberative bodies to choose between and among competing policy options, and yet a substantive due process violation does not arise whenever the government's choice prompts a known risk to come to pass"); *Hernandez v. City of Boston*, No. 16-10797, 2017 WL 1496920, at *5 (D. Mass. Apr. 25, 2017) (applying the *Collins* presumption to hold that a city's failure to maintain adequate safety policies regarding the operation of a drawbridge and to train bridge employees properly, resulting in a fatality when a bridge tender opened the bridge without first ensuring it was clear of pedestrians, was not conscience shocking); *Crockett*, 2013 WL 2983117, at *5 (holding SEPTA's decision to save money by foregoing daily railcar inspections was "the type of budgetary decision that state governments are presumptively entitled, if not forced, to make" and was "presumptively constitutional under the Due Process Clause, even if an inevitable trade-off of this decision was the creation or enhancement of a known risk" (footnote omitted)); *Goss v. Alloway Twp. Sch.*, 790 F. Supp. 2d 221, 229 (D.N.J. 2011) (holding a school district's failure to pay for sufficient padding of a cement-like playground on which numerous

children had been injured due to the district's policy of prioritizing cost-cutting measures over school safety was not conscience shocking, even though defendants knew the lack of padding increased the risk of harm to students); *Powers v. CSX Transp., Inc.*, 190 F. Supp. 2d 1284, 1290 (S.D. Ala. 2002) (holding the failure to install active warning devices promptly after their authorization at a railroad crossing known to be dangerous did not "shock the conscience so as to support a substantive due process claim" where the delay in upgrading the crossings was attributable to a defendant's failure to allocate sufficient resources to the task).

Rejecting a substantive due process claim on behalf of a student who died after falling into an open manhole that was obscured by floodwaters during a rainstorm, allegedly due to various government agencies' failure to cover the manhole, despite knowing of the tragic consequences that could arise in the event of a rainstorm in the flood-prone area, the First Circuit Court of Appeals observed that while the defendants' decision not to cover the manhole may have been "unwise or unreasonable," it did not "'shock the conscience' as that term is defined under the law." *Ramos-Pinero v. Puerto Rico*, 453 F.3d 48, 54 (1st Cir. 2006). In so holding, the court observed:

> Creating and maintaining public works such as sewers, roads, and sidewalks "involve a host of policy choices." Local governments must decide the appropriate level of resources, which are necessarily limited, to devote to those works. Even where the government is aware of specific dangers, such as open manholes, it must perform a triage among competing demands—a triage that is occasionally performed in times of emergency, such as heavy rains and flooding. Government actors must also determine, as a policy matter, how to make these decisions and what resources to devote to assessing the various competing needs. Such questions are best answered by locally elected representatives and their appointees "rather than by federal judges interpreting the basic charter of Government for the entire country."

*Id.* (quoting *Collins*, 503 U.S. at 129).

These considerations apply equally here. Like maintenance of public works, maintenance of a public transportation system involves a host of policy choices and requires policymakers to determine how to allocate limited resources among competing demands and how to make these resource allocation decisions, including deciding how to assess competing needs. Such policy choices are evident in this case. SEPTA's decisions about how to address the risks associated with the mirror configuration on the New Flyer buses—whether by training bus operators on strategies to minimize the view obstruction or by implementing mechanical interventions like those suggested by STV—involve resource allocation choices and tradeoffs, and "it is generally not for the courts to compel affirmative steps in one area at the expense of another in weighing competing policy options." *Schroder*, 412 F.3d at 730. SEPTA's decisions on these policy matters are presumed to be the product of a "rational decisionmaking process that takes account of competing social, political, and economic forces." *Collins*, 503 U.S. at 128. Because the Court is not persuaded the allegations in the Amended Complaint rebut this presumption, the Court concludes the Amended Complaint does not allege the kind of conscience-shocking deliberate indifference required to establish a substantive due process violation.[25] Accordingly, Counts XI-XV will be dismissed insofar as they are based on a *Monell* theory of liability.

### C. State Law Claims

In addition to seeking dismissal of Plaintiffs' § 1983 claims, the SEPTA Defendants also move to dismiss certain of Plaintiffs' state law claims, of which the Court has supplemental

---

[25] Because the Court agrees with the SEPTA Defendants that Plaintiffs have not alleged a violation of White and K.W.'s constitutional rights, the Court need not address the SEPTA Defendants' arguments that the Amended Complaint fails to sufficiently identify the policy or custom that caused the alleged constitutional violation or that the SEPTA Executives are entitled to qualified immunity.

jurisdiction under 28 U.S.C. § 1367(a). New Flyer and Rosco also seek dismissal of certain of Plaintiffs' state law claims against each of those Defendants.

Under 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction over state law claims if, inter alia, "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Indeed, the Third Circuit has recognized that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Borough of W. Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995) (emphasis added). Because these considerations do not weigh in favor of retaining jurisdiction, the Court will decline to exercise supplemental jurisdiction over Plaintiffs' state law claims and will instead remand those claims to the Court of Common Pleas of Philadelphia County, from which this action was removed.

**CONCLUSION**

For the reasons set forth above, the Court concludes the Amended Complaint does not allege a violation of White and K.W.'s substantive due process rights. Accordingly, the SEPTA Defendants' motion for partial dismissal will be granted in part insofar as Plaintiffs' § 1983 claims against SEPTA and the SEPTA Executives (Counts XI-XV of the Amended Complaint) will be dismissed with prejudice. Plaintiffs' remaining claims, all of which arise under state law, will be remanded to the Court of Common Pleas of Philadelphia County. The balance of the SEPTA Defendants' motion for partial dismissal and New Flyer and Rosco's motions to dismiss will be denied without prejudice to reassertion in state court.

An appropriate order follows.

BY THE COURT:

    /s/ Juan R. Sánchez
Juan R. Sánchez, J.